Good morning, Your Honors. Jardine Guajardo on behalf of Alexander Gamboa Umpa. I've been before the Court numerous times on immigration cases, and at times I come to the Court and I've come with certain items that I think are, that I need to point out to the Court that may have been, that need to be focused on a little bit more than what we've already done in our brief. And in this case, even after reviewing the government's response, I think that we've laid out in our brief our position on the case. I think that at this point I'm available to answer specific questions that the Court may have to try to clarify any. I do have a question. Yes, Your Honor. That's about the evidence of the government of changed conditions. What is your response to the fact that the conditions have changed so that your client could safely return? Your Honor, I think that whether it's this case or any other case, I think we have a situation today globally, not just in the Philippines, but globally, that dangerous conditions exist notwithstanding the amount of stability that we can inject. I mean, we, not to go too far afield, but presumably we've stabilized, we collectively, the United States, other governments that have been involved in the effort, we've stabilized the situation in Afghanistan. There are still deaths that occur in Afghanistan that may be the result of situations that cannot be controlled by the government. And in this instance here, in the Philippines, for us, for Mr. Umpa, I don't know that given the type of, given what occurred for him, that he would actually be safe anywhere. That's the real question, because if he can return to his country somewhere, although not the place he would like to return to, he's not entitled to asylum. And the real question is, have conditions changed sufficiently so that he could return to someplace in the Philippines and be safe? And I don't know that unless, other than providing a country conditions that are general in nature, I mean, we can say, you know, they have great travel packages right now to Manila, and you can go to Mindanao, you can go to these various places, but unless I think that once a respondent, before the Immigration Service, once a non-citizen has set forth his claim and has set forth factually what happened, I think that the burden really is on the agency to come forth with something that's very specific as to that individual. To rely on the general country conditions that have changed, I think, is not sufficient in these cases. I don't see why not. They did come forward with the country report. And with countries, well, actually, when my wife and I go on vacation, we've sometimes gone to countries where there are certain parts of the country that we don't go to because it's too dangerous there. It's not unusual for government to have trouble maintaining its authority in some parts of the country. And the country report seems to say that most of the Philippines is all right now. What's the matter with that? I think that, once again, and not to repeat myself, I think that the. . . You said they have to come forward with something, and I said, well, didn't they, the country report? And the country report is general. Again, any of us could probably pick up a travel brochure for the Philippines that we'd find some great packages. But to the extent that this respondent lost family members, to the extent that this respondent actually has testified, this is what happened to me. I don't know that we can say today that, given general country condition reports, without more from the agency coming forth and saying, notwithstanding what has transpired, it is still safe for him. I don't think that we can actually rely just on this general country conditions report. It would be insufficient. Now, what about the credibility? On the credibility, I guess some of the things that particularly struck me were, he walks right into a police station, but he doesn't tell the police what happened to him. Instead, he calls somebody else. And I was also kind of struck by the business with the wife, where it looks like he was trying to set up a marriage fraud to stay in the U.S., and that seemed to influence the IJ on credibility, I think. I think that, well, if I can take the second item first, I think the agency has an obligation to investigate any relationship that is put before them in order to secure benefits. The legislative intent in having the Anti-Fraud Marriage Act was an attempt to clean house so that the agency had some way to control the large number of visa petitions that came in and to have some type of control even after someone was married, received their conditional green card, that after two years that they would come forth and they would be able to show that it was a bona fide relationship. I think that that's a responsible way to handle immigration to the United States. I think to the extent that an agency representative is before an immigration judge, and that agency representative, if he has hard evidence, if you will, if he has sufficient evidence that he can bring forth a witness and he can put that witness on the stand and he can ask her or him, did you marry this individual, this beneficiary? Did you marry him solely to gain an immigration benefit? And if that person can understand, say, yes, I did, I think that that's good, because I think it helps to alleviate the burden of many applications being submitted that cause problems for everyone, and it also gives an opportunity for the respondent before the immigration service, the noncitizen, to be able to confront that individual who is now, say, this was not a real marriage. That's not what happened here. I think if you look at page 11 of the government's brief, page 11, specifically, I'm sorry, yeah, it's 11. Pardon me for a moment. Up at the top, UNPA withdrew his application for suspension of deportation as an abused spouse, and the INS withdrew his ex-wife's statement that the marriage was fraudulent. I'm sure that the court recognizes that when you're in trial, there's you give up certain aspects of your case that you believe will give you an advantage, both sides do. In this instance, if the prosecution actually had a statement that was a definite statement, this is a marriage fraud, there's no reason to give that up. You're prosecuting a case, and you have a video of the crime occurring. What about the other things, the differences between what he said to the asylum officer and what he said to the IJ, and walking into a police station and not telling them what happened? I apologize for not being able to provide the court the citation to this case, but there's a case that was just decided by this court within the last 10 days, I believe. And, again, I apologize for not having the citation. I'll take steps to provide afterwards appropriate procedure to do that. But this court has held just recently that you cannot make a conclusion that the alien, the non-citizen lacks credibility simply because his testimony at the time of hearing is greater than what he or she set forth in his asylum application or even at the asylum officer. And I think, I hope Judge Reinhart doesn't mind me quoting him, but Judge Reinhart, when I was down in Pasadena this summer, made mention that the court is well aware of just the deplorable situation in which asylum applications are completed by non-attorneys, and the fact that so many of them have information that does not convey factually correct information for the applicants, so it's very much a problem that's endemic in just this type of practice that individuals who are seeking to obtain benefits may find themselves in a position where they don't have the most complete application with all the information. So I'd ask the court not to find that there's a lack of credibility simply because the testimony is more expansive than what was on the application. I believe I've run out of time. Thank you, Your Honor. Thank you, counsel. Good morning. May it please the Court. I'm Joshua Bronstein for the Attorney General. The record in this case is far from compelling a conclusion that Mr. Umpa was credible during his immigration proceedings. And there are numerous inconsistencies throughout his testimony, both internally where he doubled back and flat out contradicted himself, as well as inconsistencies between his testimony and his asylum applications, both of them, and between his testimony to an asylum officer and during his immigration proceeding. May I just ask you a question about that? Isn't it fundamentally unfair to rely upon the discrepancies when there is no opportunity to cross-examine the asylum officer? Not in this case, Your Honor, and not generally. And there are two principal reasons for that. Number one, the immigration judge in his average credibility finding mentions this asylum officer's assessment. But if you look at the record, you can see that record at, I believe, 170, the INS attorney, then INS, now Department of Homeland Security, was cross-examining the petitioner and said, did you go back to work for the police? No. Never? Never. And so then he said, without showing him any document, he said, but didn't you testify to an asylum officer that you had gone back, led a raid, an investigation, and a raid, and then there was a gun battle? And the response was, the response was, yeah. That was what I was thinking of, like how they call like a revenge thing. So he is now ten seconds after saying that he never went back to work, he is now trying to figure out how he answers this question. He's admitting that he has testified previously this way. And so he explained he went back to the workplace, but he didn't go back to work. He went back to discover witnesses. Well, no, Your Honor. And if you look at his asylum applications, you'll see that, in fact, in his declaration for his asylum application, he states, and this is the evidence before the immigration judge, he states that he, in fact, led an investigation and there was a raid. And so it is, I mean, there's, I mean, his story simply changes several times at the same time. Where are we supposed to look? That is a. . . I'm looking at the administrative record, I guess. That's right, Your Honor. Just tell the page number. Well, I'm. . . You look like you were looking at it. I was. Well, you know what I had, Your Honor, was the asylum officer's assessment right there. I did run across this. I would note this, though, and it goes to the immigration judge's finding in particular, where he was asked whether he engaged in a gun battle. And that's record at 170-171. And his testimony that he couldn't remember, and I think that's what's significant, was his testimony that he didn't recall. I mean, I'm at 171 right now. This is a question posed to him. Sir, did you or did you not go back three days after you were released and led your colleagues to the outskirts of Manila in search of your attackers? A gunfight ensued, and there were several casualties among the guerrillas. His response, see, I don't recall. Now, I would submit that if you were to have, well, you would know one way or another, if days or weeks before you left the Philippines, fearing for your life, you would recall one way or the other whether you, one, went back to the police station you worked at, and, two, if you're telling the truth, and, two, you would certainly remember whether or not you were in a gun battle and whether or not you led a raid. It is not the kind of thing that any honest person would forget. I would also note that the asylum officers, and I'm getting back to – Let me see if I've got this right. He tells the I.J. I never went back to work for the police. He tells the asylum officer I went back to the police. I led a raid, and we had a gun battle? That's right, Your Honor. Okay. And then in his hearing, he said he couldn't recall. In his hearing, when he's asked about what he told the asylum officer, he tells the I.J. He doesn't recall whether he went back to the police, led a raid, and led a gun battle. Yes, Your Honor. But that's only after he contradicts himself, because he does say also at page 171, he's asked, you went back just to let them what, sir? And now he has ensnared himself, as we discussed in our brief, hopelessly in this lie. And so then he says, at the top of 171, he says, to apprehend the killers of my family. I just want to be there to work and witness what they're going to do. So then he says he's a witness. But this is, of course, a page after he says that at the top of 170, he says that they never got back in touch with me. I just told them what happened to me, and then nobody got in touch with me. And then he was asked, did you ever go back to work for them? He said no. Now, the document, and I'm a little far afield from the answering Judge Nelson's question, which is, you said, is it improper to use the asylum officer's assessment? And the answer is no, for two reasons. One, if it was used, to the extent it was used at all, it was used for impeachment purposes, which is proper. As we noted, footnote six of our brief. And number two, and more significant, the asylum officer's assessment, and this is the critical point on this, it was Petitioner's own exhibit. He was a proponent, if not the proponent, he was a proponent of that exhibit. And if you look at the record at page 172, the I.J. said, what is this asylum officer's assessment doing in the record? And the I.N.S. attorney at page 171 says, Mr. Stolle says, I don't know. He says, I don't know. I just said this is what I got. Well, then Mr. Guajardo, who was the attorney then and now at all relevant points, then he said, Mr. Guajardo says, oh, the assessment sheet is in there because it indicates that the interview, albeit it was denied, the officer found him credible. And at this point, it is clear that he has adopted this as an exhibit that he wants to use to show that his client is credible. So he is not only not objective to the use of this document at this point, but he is now going to advocate. And he goes on to say, Mr. Stolle, the I.N.S. attorney, tries to interrupt him. He says, yeah, sure, I'll concede to that. Mr. Guajardo says, found him to be credible. And then he says, convincing. And Mr. Stolle tries to interrupt again. And then he says, specific and relevant and found. And then at this point, the I.N.S. attorney says, wait a minute. Judge, I'm in the middle of cross-examination here. Actually, I have to stop Mr. Guajardo from continuing to advocate on behalf of this document. And so it is fundamentally wrong for him to now say that it was improperly used when he was, if not the sole proponent, a proponent of it. And there's more, because this is an evidentiary issue that should have been raised with the Board of Immigration Appeals. And I should have made this argument first, but it's not in our brief, and I apologize for that, but it is a jurisdictional argument. He has failed to exhaust his administrative remedies with respect to this document. He has never raised it as an issue to the Board of the Immigration – the Board of Immigration Appeals or to the immigration judge. And so this Court is precluded from considering the issue under 8 U.S.C. Your Honor? You mean the hearsay issue? Yes, Your Honor. The document – yes, Your Honor. He was not only a proponent of it, but he never raised it as an issue. He didn't object at the I.J. hearing, and he didn't raise it as an issue before the Board. And so the Court can't even consider it under 8 U.S.C. section 1252d1. And this Court has clearly held that if an alien or Petitioner fails to present the claim to the Board, this is not a futility situation or a constitutional issue. It's a pure evidentiary issue. I would – I would like to get back to the adverse credibility and note several instances in the – in the record which are serious inconsistencies which also go to the heart. The two the immigration judge mentioned, I think, are clear. And we discussed the first in our brief, and I've mentioned it briefly. And there are – there are many others. For instance, he's terribly unclear as to when he found out about whether his father and brothers were allegedly killed or when they died. He says several times, record in particular at 123, he says he learned two to three weeks after their death – no, two to three weeks after he was released from custody, he learned that they died, which is, I think, by itself a bit on the outlandish side because he wasn't out of the country. It's – it's absurd to suggest that he couldn't have found this out earlier. And then he realizes this, and then at page 168, he says he found out a day or two after. And when questioned about that, he says, well, their deaths were confirmed two or three weeks later. Of course, they had already been buried because they were Muslim, and he testified that they were buried the same day. There are – there are inconsistencies. I see I'm running low on time, but I would note this. At record 139, there is – he – even though prompted by Mr. Guajardo at the time, he testifies that he has no recollection of any other run-ins with the NPA. This is substantial. This is not an embellishment case. This is a case where a person who says in 1991 he was beaten mercilessly and still bears a scar on his knee, he has no recollection of that. Record at 139. It's in his asylum application, both of them, and it's absent from his – his testimony to the asylum officer. And so there – I mean, the record is simply replete. At one point, he thinks he was driving his brother's car. At record at 160, then no, it was his own car. And I see I'm out of time, but I – I believe that a cursory review of this record indicates that this Petitioner could simply not get his story straight about material aspects of his claim, and certainly the asylum officer's assessment was not only not improperly used, but court lacks jurisdiction to consider that argument, unless there are any other questions. Thank you, counsel. Thank you, Your Honor. The case of Ompa v. Ashcroft is submitted. Next is United States v. Cortez Arias.
judges: D.W. Nelson, Kleinfeld, Gould